# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DEBRA JAVENS,<br><br>          Plaintiff,<br>vs.<br><br>GE HEALTHCARE INC. and GENERAL ELECTRIC COMPANY,<br><br>          Defendants. | Civil Action No.<br><br>**COMPLAINT FOR DAMAGES**<br><br>1)   STRICT LIABILITY: FAILURE TO WARN;<br>2)   NEGLIGENCE |

COMES NOW Plaintiff DEBRA JAVENS (hereinafter "Plaintiff"), and alleges as follows:

## PARTIES

### Plaintiff

1.      Plaintiff Debra Javens is a resident of Erie, Pennsylvania.  Debra Javens was administered a gadolinium-based contrast agent called Omniscan, which was manufactured and sold by GE Healthcare Inc. and General Electric Company (hereinafter collectively referred to as "GE" or "Defendants").

2.      Plaintiff Debra Javens suffers from Gadolinium Deposition Disease (hereinafter referred to as "GDD").  GDD is an incurable, painful disease.  Plaintiff contracted GDD as a result of receiving MRIs and MRAs using intravenous injections of Omniscan.

### Defendants

3.      GE manufactures, markets, and sells Omniscan, a gadolinium-based contrast agent ("GBCA") that was injected into Plaintiff's body.

4.      Defendant GE Healthcare Inc. is a Delaware corporation with its headquarters located in Massachusetts.  GE Healthcare Inc. is engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing Omniscan into interstate commerce, either directly or indirectly through third parties or related entities.  This Court has personal jurisdiction over said Defendant under the doctrine of general jurisdiction because said Defendant resides in Massachusetts.

5.      Defendant General Electric Company is a New York corporation with its headquarters located in Massachusetts.  General Electric Company is engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing Omniscan into interstate commerce, either directly or indirectly through third parties or related entities.  This Court has personal jurisdiction over said Defendant under the doctrine of general jurisdiction because said Defendant resides in Massachusetts.

6.      At all times relevant to this Complaint, the Defendants advertised, promoted, marketed, distributed, and sold Omniscan in Massachusetts and nationwide.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction because the amount in controversy exceeds $75,000 exclusive of interest and costs.  There is a complete diversity of citizenship between Plaintiff and Defendants.  Plaintiff is a resident and citizen of and is domiciled in the State of Pennsylvania.  As set forth more fully above, all Defendants are entities residing in the Commonwealth of Massachusetts.

8.      This Court has personal jurisdiction over Defendants, each of which is licensed to conduct and/or is systematically and continuously conducting business in the Commonwealth of Massachusetts, including, but not limited to, the marketing, researching, testing, advertising, selling, and distributing of drugs, including Omniscan and Optimark, to the residents in this Commonwealth.

9.      Venue is proper in this District because Defendants reside in Boston, Massachusetts.  Defendants marketed, advertised, and distributed the dangerous product in this District; Defendants do substantial business in the Commonwealth of Massachusetts and within this District; and at all times relevant hereto, Defendants developed, manufactured, promoted, marketed, tested, researched, distributed, warranted, and sold Omniscan in interstate commerce.

## FACTS

10.     Plaintiff Debra Javens had normal kidney function prior to developing Gadolinium Deposition Disease ("GDD").  Plaintiff Debra Javens was subjected to one or multiple MRAs and/or MRIs.  At the time of these procedures, Plaintiff was injected with the gadolinium-based contrast agent Omniscan.  Unbeknownst to her, she developed GDD soon thereafter.  Plaintiff Debra Javen's symptoms of GDD include but are not limited to the following: cognitive impairment, burning sensation on her skin, heart palpitations, pain throughout her body.

11.     Gadolinium Deposition Disease ("GDD") is the name for a disease process observed in people with normal or near-normal renal function who develop persistent symptoms that arise hours to months after the administration of gadolinium-based contrast agents like Omniscan.  In these cases, no preexistent disease or subsequently developed disease of an alternate known process is present to account for the symptoms.  People suffering from GDD experience symptoms consistent with the known toxic effects of retained gadolinium.  Typical clinical features of GDD include persistent headaches, bone and joint pain, and clouded mental activity.  People with GDD often experience subcutaneous soft-tissue thickening that clinically appears somewhat spongy or rubbery.  Tendons and ligaments in a comparable distribution may also be painful and have a thickened appearance.  People with GDD often experience excruciating pain, typically in a distal distribution, of the arms and legs but may also be in the torso or generalized in location.  This pain is often described as feeling like sharp pins and needles, cutting, or burning.  GDD often progresses to painful inhibition of the ability to use the arms, legs, hands, feet, and other joints.  GDD is a progressive disease for which there is no known cure.

12.     GDD is a man-made disease.  It only occurs in patients who have received a gadolinium-based contrast agent for an MRI or an MRA.

13.     Gadolinium is a highly toxic heavy metal.  It does not occur naturally in the human body.  The only known route for gadolinium to enter the human body is injection of a gadolinium-based contrast agent.

14.     During the years that Defendants have manufactured, marketed, distributed, sold, and administered gadolinium-based contrast agents, there have been numerous case reports, studies, assessments, papers, peer reviewed literature, and other clinical data that have described and/or demonstrated GDD in connection with the use of gadolinium-based contrast agents.  In addition, there have been a significant number of publicized complaints and comments from those individuals afflicted with GDD and others seeking to help these individuals.  This information was all available to the Defendants several years ago and put them on notice of the issues that give rise to Plaintiff's causes of action alleged herein.

15.     During the time period when Plaintiff received injections of the Defendants' gadolinium-based contrast agents, Defendants knew or should have known that the use of gadolinium-based contrast agents created a risk of serious bodily injury in patients with normal or near-normal kidney function.

16.     Defendants failed to warn Plaintiff and her healthcare providers about the serious health risks associated with gadolinium-based contrast agents (including Omniscan) and failed to disclose the fact that there were safer alternatives.

17.     As a direct and proximate result of receiving injections of gadolinium-based contrast agents manufactured, distributed, marketed, and/or sold by Defendants (including Omniscan), Plaintiff developed GDD.

18.     Defendants have repeatedly and consistently failed to advise consumers and/or their healthcare providers of the causal relationship between gadolinium-based contrast agents and GDD.  Defendants knew or should have known of the risk of GDD posed by gadolinium-based contrast agents (including Omniscan) to individuals with normal or near-normal kidney function.

19.     Had Plaintiff and/or her healthcare providers been warned about the risks associated with gadolinium-based contrast agents (including Omniscan), she would not have been administered gadolinium-based contrast agents and would not have been afflicted with GDD.

20.     As a direct and proximate result of Plaintiff's being administered gadolinium-based contrast agents (including Omniscan), she has suffered severe physical injury and pain and suffering, including, but not limited to, the effects of GDD.

21.     As a direct and proximate result of being administered gadolinium-based contrast agents (including Omniscan), Plaintiff suffered and continues to suffer significant mental anguish and emotional distress and will continue to suffer significant mental anguish and emotional distress in the future.

22.     As a direct and proximate result of being administered gadolinium-based contrast agents (including Omniscan), Plaintiff has also incurred medical expenses and other economic damages and will continue to incur such expenses in the future.

## APPLICATION OF THE DISCOVERY RULE AND THE HISTORY OF DEFENDANTS' FRAUDULENT CONCEALMENT OF INFORMATION

23.     The nature of Plaintiff Debra Javens' injuries and damages, and their relationship to gadolinium-based contrast agents used in conjunction with MRIs and MRAs (including Omniscan), was not discovered, and through reasonable care and due diligence could not have been discovered, by Plaintiff, until a time less than two years before the filing of this Complaint. At one point, Plaintiff became aware that she had retained gadolinium from the Omniscan gadolinium-based contrast agents that were injected into her.  However, she was not aware of the connection between his symptoms and gadolinium retention until a later date.

24.     Plaintiff became aware of GDD in or around August 2016 upon publication of "Gadolinium in Humans: A Family of Disorders," in Volume 207:2 of the American Journal of Roentgenology.

25.     In 1984--prior to FDA approval-- the inventors of gadolinium-based contrast agents claimed that their product, Gd-DTPA, did not cross the blood-brain barrier, and that the bonds between the Toxic Gadolinium and its protective coating did not break inside the body. Additionally, they claimed that there would be no toxic gadolinium residue left behind to cause illness.

26.     Magnevist was the first gadolinium-based contrast agent to reach the market after receiving FDA approval in 1988.  There are two basic types of contrast agents differentiated by their chemical structure which include linear agents and macrocyclic agents.  The main difference is that the linear agents do not fully surround the gadolinium ion, whereas the macrocyclic agents form a complete ring around gadolinium ion which creates a much more difficult bond to break.  The linear agents include: Magnevist (manufactured by Bayer), Omniscan (manufactured by Manufacturing Defendants), Optimark (manufactured by Guerbet), and Multihance (manufactured by Bracco).  Greater safety due to the stronger bonds of the macrocyclic contrast agents as compared to their linear contrast counterparts has been well established by scientists (Huckle, et al. 2016).

27.     Then, coincidentally again in 1988 it was recognized that gadolinium was breaking free from the bonds in the linear based contrast agents and this was in part due to the competition for its protective layer (chelate) by other essential metals in the body such as zinc, copper, and iron (Huckle, et al. 2016).  Furthermore, emerging science showed that the bond between toxic gadolinium and its chelate or cage (Gd-DTPA) became very weak and separates easily in low pH conditions such as those found in many compartments of the human body including extracellular fluid spaces.

28.     Stability differences among gadolinium contrast agents have long been recognized in laboratory (in vitro), and deposition of toxic gadolinium in tissues has been described in animal models since at least 1984.  The first major study that showed deposition in humans appeared in 1998 regarding patients with renal failure and later in 2004 in patients with normal renal function (Huckle, et al. 2016).

29.     The laboratory (in vitro) studies assessing the stability of each gadolinium-based contrast agent in human blood were performed and demonstrated that, over time, greater percentages of gadolinium were released from linear agents as compared to the macrocyclic agents which showed superior stability.  The lack of stability seen within the linear agents was not considered to be a problem as long as the contrast agent was excreted out of the body according to the claimed drug's half-life, before the chelate could release the toxic gadolinium. However, it was later noted that other conditions could cause prolonged retention of the contrast agents, thus allowing more toxic gadolinium to be released in the bodies of patients.  In addition, a delayed elimination phase of the gadolinium-based contrast agents would later be discovered.

30.     Peer-reviewed articles on the deposition of gadolinium in animals with normal renal function, some illustrating deleterious consequences, have been published as early as 1984.

31.     Three months after the FDA approval of Omniscan, the preclinical safety assessment and pharmacokinetic data were published describing its pharmacokinetics in rats, rabbits, and cynomolgus monkeys.  These studies demonstrated that while toxic gadolinium was no longer detectable in the blood 7-days after administration, quantifiable concentrations of gadolinium were persistent in both the renal cortex and areas around bone cartilage.

32.     The first report of toxic gadolinium retention in humans may have been presented in September 1989, a little over 1 year after the approval of Magnevist.  Authors Tien et al. reported that intracerebral masses "remained enhanced on MRI images obtained 8 days after injection of gadolinium DTPA dimeglumine (Magnevist)."  Subsequent chemical analysis revealed that a high concentration of gadolinium remained in the tissue.  After this report, however, there was no further mention of gadolinium retention in humans until 1998.

33.     The Defendants knew that their product Omniscan did not have very stable bonds and could come apart easily causing significant toxicity in humans.

34.     Over the next 18 years, more evidence was forthcoming, and research began to flourish regarding the release of toxic gadolinium from the linear contrast agents such as Omniscan, and its long-term retention in the bodies of animals and humans.  Nephrologists and

other scientists connected the administration of linear gadolinium-based contrast agents, including Omniscan, to a rapidly progressive debilitating and often fatal condition called gadolinium-induced Nephrogenic Systemic Fibrosis (NSF), prompting the Food and Drug Administration (FDA) to issue a black box warning on all gadolinium-based contrast agents in 2006. NSF is a horrible disease in which patients' skin and vital organs fibrose, becoming wood-like. There were over 500 NSF cases reported and estimated to be well over a thousand non-reported. Over 500 lawsuits were filed against gadolinium-based contrast manufacturers. All of them settled before trial except *Decker vs. GE* (Omniscan), which resulted in a five-million-dollar verdict for Mr. Decker. Unfortunately, Mr. Decker passed away from his gadolinium triggered disease before the verdict was reached.

35.    Because obvious signs of clinical pathology associated with NSF were only seen in patients who had severely reduced renal function, it was widely (and wrongly) assumed by the public that people with normal renal function were not getting sick and there were no other concerns. However, research continued to report evidence that toxic gadolinium was being stored in people with normal renal function.

36.    Although many patients with debilitating symptoms who had normal renal function that received injections with gadolinium-based contrast agents had already been reporting adverse reactions for years to the FDA, manufacturers, and poison control, no link between gadolinium and their symptoms were ever officially made publicly. This is partially due to the fact that blood and urine testing for gadolinium only became available recently. Additionally, most doctors were not aware of any disease that was associated with gadolinium other than NSF, which is said to only occur in patients with renal failure. Gadolinium Toxicity is an underreported and underdiagnosed condition. Over the past six years (since the link between gadolinium-based contrast agents and NSF was acknowledged) patients with normal renal function have been forming advocacy groups and coming forward to create awareness for their condition. Symptomatic patients often have documentation of high levels of gadolinium in their blood and urine several days, weeks, months and even years after their exposure to gadolinium-

based contrast agents.  Many patients even had tissue biopsies of various parts of their body that showed additional evidence of retained gadolinium years after their exposure.

37.     Patients sent several strongly worded letters with scientifically-supported research data to the FDA, warning about the occurrence of gadolinium toxicity in those with normal renal function following injections of gadolinium-based contrast agents.  Correspondence was confirmed as early as 2012.

38.     In 2013, while examining non-contrast enhanced MRI images, Japanese researchers found evidence of retained gadolinium in the brains of patients with normal renal function that had previously received one or more injections of gadolinium-based contrast agents up to several years prior.  They found that the brain had hyperintense signals in critical areas of the brain.  These were very alarming findings.

39.     These findings were confirmed by scientists at the Mayo Clinic in 2014 when autopsy studies were performed on 13 deceased individuals, all of whom had normal or near normal renal function and who had received six or more injections of gadolinium-based contrast agents in the years prior.  Up to 56 mcg of gadolinium per gram of desecrated tissue were found within the brains of these patients.

40.     As these new findings emerged, the entire radiology community was put on high alert, with several large universities conducting research to further address this concern.

41.     In July of 2015, and in direct response to the Mayo Clinic study's findings, the FDA issued a new public safety alert.  The FDA is evaluating the risk of brain deposits from repeated use of Gadolinium-based contrast agents use in MRI's and they now have their National Center for Toxicological Research team working on determining the exact consequences of these new findings.

42.     In September 2017, the FDA's medical advisory committee voted 13 to 1 in favor of adding a warning on labels that gadolinium can be retained in some organs, including the brain, even in patients with healthy kidneys.

43.     Defendants have known about the risks that gadolinium-based contrast agents (including Omniscan) pose to people with normal kidney function for years.  Pharmacokinetic studies in 1991 indicated that gadolinium retention was occurring in people with normal renal function.[1]  In 2004, gadolinium was shown to be deposited in the resected femoral heads of people who had undergone gadolinium-chelate enhanced MRI studies.[2]  Since then, studies have continued to indicate that gadolinium remains within people's bodies long after the suggested half-life.

44.     Despite this well-documented evidence of gadolinium retention, Defendants have continuously failed to warn consumers and their healthcare providers on the label of their product, Omniscan.  In 2012, Defendants corrected their label to include contraindications for use in people with kidney disease and acute kidney injury.  Yet, Defendants have failed to update their label to reflect the extensive evidence of gadolinium retention in people with normal renal function.

45.     Defendants were also involved in prior litigation involving these products and have made statements about these products denying that they cause the types of injuries alleged in this complaint.

46.     Defendants are estopped from asserting a statute of limitations defense because all Defendants fraudulently concealed from Plaintiff the nature of Plaintiff's injuries and the connection between his injuries and all Defendants' tortious conduct.

## FIRST CAUSE OF ACTION
### (Against All Defendants)
## STRICT LIABILITY: FAILURE TO WARN

47.     Plaintiff incorporates by reference and realleges each paragraph set forth above.

---

[1] Schumann-Giampieri G, Krestin G. Pharmacokinetics of Gd-DTPA in patients with chronic renal failure. *Invest Radiol.,* 1991; 26:975-979.

[2] Gibby WA, Gibby KA, Gibby WA. Comparison of Gd DTPA-BMA (Omniscan) versus Gd HP-DO3 (ProHance) retention in human bone tissue by inductively coupled plasma atomic emission spectroscopy. *Invest Radiol.,* 2004; 39:138-142.

48.     Defendants' gadolinium-based contrast agents were defective due to inadequate warnings or instruction for use, both prior to marketing and post-marketing.  Defendants knew or should have known that their products created significant risks of serious bodily harm to consumers.  Defendants failed to adequately warn consumers and their healthcare providers of such risks.

49.     Because of Defendants' failure to provide adequate warnings with their products, Plaintiff was injected with gadolinium-based contrast agents which the Defendants manufactured, designed, sold, supplied, marketed, or otherwise introduced into the stream of commerce.  Those gadolinium-based contrast agents are the legal cause of Plaintiff's serious physical injuries, harm, damages, and economic loss.  Plaintiff will continue to suffer such harm, damages, and economic loss in the future.

50.     The foregoing acts, conduct and omissions of Defendants were vile, base, willful, malicious, wanton, oppressive and fraudulent, and were done with a conscious disregard for the health, safety and rights of Plaintiff and other users of Defendants' products, and for the primary purpose of increasing Defendants' profits.  As such, Plaintiff is entitled to exemplary damages.

<u>**SECOND CAUSE OF ACTION**</u>
<u>**(Against All Defendants)**</u>
<u>**NEGLIGENCE**</u>

51.     Plaintiff incorporates by reference and realleges each paragraph set forth above.

52.     Defendants had a duty to exercise reasonable care in the design, formulation, testing, manufacture, labeling, marketing, sale and/or distribution of gadolinium-based contrast agents (including Omniscan) and the MRI and MRA machines designed to be used in conjunction with gadolinium-based contrast agents.  In particular, they had a duty to ensure that their products did not pose an unreasonable risk of bodily harm and adverse events.

53.     Defendants failed to exercise reasonable care in the design, formulation, manufacture, sale, testing, marketing, or distribution of gadolinium-based contrast agents (including Omniscan) and the MRI and MRA machines designed to be used in conjunction with

gadolinium-based contrast agents in that they knew or should have known that the products could cause significant bodily harm or death and were not safe for use by certain types of consumers.

54. Defendants failed to exercise ordinary care in the labeling of gadolinium-based contrast agents (including Omniscan) and the labeling of MRI and MRA machines designed to be used in conjunction with gadolinium-based contrast agents and failed to issue to consumers and their health care providers adequate warnings concerning the risks of serious bodily injury due to the use of gadolinium-based contrast agents (including Omniscan) and the MRI and MRA machines designed to be used in conjunction with gadolinium-based contrast agents.

55. Despite the fact that Defendants knew or should have known that gadolinium-based contrast agents (including Omniscan) and the MRI and MRA machines designed to be used in conjunction with gadolinium-based contrast agents posed a serious risk of bodily harm to consumers, Manufacturing Defendants unreasonably continued to manufacture and market gadolinium-based contrast agents (including Omniscan) and the MRI and MRA machines designed to be used in conjunction with gadolinium-based contrast agents and failed to exercise reasonable care with respect to post-sale warnings and instructions for safe use.

56. At all relevant times, it was foreseeable to Defendants that consumers like Plaintiff would suffer injury as a result of their failure to exercise ordinary care as described above.

57. As a direct and proximate result of Defendants' negligence, Plaintiff has suffered physical injuries, harm, damages, and economic loss and will continue to suffer such harm, damages, and economic loss in the future.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

    a) Compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

b) Past and future medical expenses, income, and other economic damages in an amount to be determined at trial of this action;

c) Punitive damages in an amount to be determined at trial of this action;

d) Pre-judgment and post-judgment interest;

e) Attorneys' fees, expenses, and costs; and

f) Such further relief as this Court deems necessary, just, and proper.

## DEMAND FOR JURY TRIAL

In addition to the above, Plaintiff hereby demands a trial by jury for all causes of action and issues that can be tried by a jury.


Dated: May 3, 2018

RESPECTFULLY SUBMITTED,

ANDRUS WAGSTAFF, P.C.

By: _____

Kim Dougherty
**ANDRUS WAGSTAFF, PC**
19 Belmont Street
South Easton, MA 02375
Telephone: (580) 230-2700
Email: *kim.dougherty@andruswagstaff.com*

CUTTER LAW, P.C.

By: _____

Todd A. Walburg *(Pro Hac Vice Pending)*
**CUTTER LAW, P.C.**
401 Watt Avenue
Sacramento, CA 95864
Telephone: (916) 290-9440
Facsimile: (916) 588-9330
Email: *twalburg@cutterlaw.com*

Attorneys for Plaintiff DEBRA JAVENS